# EXHIBIT 1

9 (a) dealing with the troublesome question of majority rule and the rights of minority groups also strengthens the bill by preventing any questions of minority representation being raised. The original wording was not altogether clear on this point.

Sincerely yours,

FRANCES PERKINS.

---

NATIONAL LABOR RELATIONS BOARD,
*Washington, D. C., May 17, 1935.*

Hon. WILLIAM P. CONNERY, Jr.,
*House Office Building, Washington, D. C.*

MY DEAR MR. CONGRESSMAN: In answer to your favor of the 10th, enclosing a copy of H. R. 7978, national labor relations bill, I note that this bill is identical with Senator Wagner's bill as it came out of the Senate Committee on Education and Labor, with the exception of section 3 (a) of the House bill. The language in the Senate bill is: "There is hereby created as an independent agency in the executive branch of the Government." The language of the House bill reads: "There is hereby created in the Department of Labor." Otherwise the two bills are identical.

We are of opinion that the amendment proposed by your committee is distinctly harmful to the general purposes of the bill. It may be a matter of doubt what are the implications of the unexplained phrase "created in the Department of labor." Were it not for the fact that your committee declined to accept one of the amendments proposed by the Secretary of Labor specifically subjecting to the approval of the Secretary the Board's appointment of employees, it might have been assumed that putting the Board "in the Department of Labor" carried with it automatic control by the Secretary over personnel. The phrase "created in the Department of Labor" might also carry the implication of budg-

## 11

etary control, which inevitably, though indirectly, enables the Secretary to influence the policy of the Board. Believing as we do that the independence of the Board should be established upon an unquestionable basis, we favor the unequivocal Senate version creating the Board "as an independent agency in the executive branch of the Government."

The value and success of any quasi-judicial board dealing with labor relations lies first and foremost in its independence and impartiality. After all, although the bill deals with the rights of labor, for the success of the machinery contemplated by the act it must in the long run have the confidence of industry and of the public at large. In our view it is in derogation of such independence and such impartiality to attach the Board to any department in the executive branch of the Government, and particularly to a department whose function in fact and in the public view is to look after the interests of labor.

The Board is to administer an act of Congress laying down a specific policy. If the Board is subject to the control of the Secretary of Labor as to personnel and budget, there will be an inevitable tendency to conform the administrative policies of the Board to the policies of the particular administration in power.

Where Congress has defined a policy and created an administrative board to carry out that policy, it has with marked consistency recognized that the board so created should be appointed for comparatively long terms of office and be free of control by the executive departments or by any particular administration. The arguments advanced for putting the Board in the Department of Labor would, if accepted by the Congress, have resulted in putting the Interstate Commerce Commission, the Federal Trade Commission, the Communications Commission in the Department of Commerce, and the Reconstruction Finance Corporation in the Treasury Department, instead of their being given an independent status. A similar observation may be made with reference to the Securities Exchange Commission and the National Mediation Board. It is of profound significance that the four outstanding permanent administrative agencies created by the last Congress to effectuate declared congressional policies were established as independent agencies; these are the Securities Exchange Commission, the Communications Commission, the Federal Housing Administration, and the National Mediation Board. Considering the specific quasi-judicial functions of the proposed National Labor Relations Board, there are even stronger reasons

why it should have the prestige of independent status, than there were for establishing the National Mediation Board, to quote the words of its Organic Act, "as an independent agency in the executive branch of the Government."

It may be further observed that the multiplication of the functions of Cabinet officers has already proceeded to such a point that the practical supervision of any further agencies set up by the Congress, if entrusted to the departments, would necessarily be exercised by subordinates, themselves often overworked, and often not intimately acquainted with the special problems.

We wish to emphasize the essential difference between mediation and conciliation in adjusting disputes over wage and hour demands, and the work of the National Labor Relations Board in handling 7 (a) cases under the present law, or the work of the proposed new board in handling complaints that an employer has been guilty of unfair labor practices under the pending legislation. Wages and hours, apart from minimum standards prescribed by the codes, are a matter of give and take, in which conciliation serves a useful function. But the rights of labor under section 7 (a), or under the Wagner-Connery bill, are written into the law to be enforced, not to be bargained about or compromised. When a complaint of law violation is presented to the National Labor Relations Board or one of its regional boards, it is the function of the Board to see that the law is vindicated. Compliance with the law is often obtained without the necessity of formal hearings, or after hearing and before enforcement processes are involved; but obtaining such compliance is quite different from the mediation which is the function of the Conciliation Service of the Department in settling disputes about wages and working conditions.

As Senator Wagner said in his testimony before the Senate Committee on Education and Labor:

"The atmosphere of compromise and adaptation is perfectly suited to the settlement of disputes concerning hours and wages where shifting scales are fitting to particular conditions. But it is unsuited to section 7 (a) which Congress intended for universal application, not universal modification. The practical effect of letting each disputant bargain and haggle about what section 7 (a) means is that the weakest groups which need its basic protection most receive it the least."

## 12

The National Labor Relations Board, as set up by Executive order of June 29 1934, though it was directed to make its reports to the President through the Secretary of Labor, and directed not to duplicate the mediatory and statistical work of the Department, has nevertheless been, in its administration of section 7 (a) and in its control of its own personnel and expenditures, an agency independent of the Department. This independence has not resulted in the duplication of work which the Secretary fears as likely to result from the bill as it passed the Senate. The Board has taken pains not to encroach upon the work of the conciliation service of the Department.

It has proceeded under a harmonious working arrangement with the Department, specifying the respective functions of the board and the Department. It has found no difficulty, indeed has had the warmest cooperation of the Department, in the matter of making use of the Department's statistical and research agencies and other facilities. To make it abundantly clear that there shall be no duplication of work, the Senate committee inserted an amendment, which was entirely agreeable to the board, forbidding the board to appoint persons to engage in mediation, conciliation, or statistical work when the services of such persons may be obtained from the Department of Labor. That provision also appears in section 4 of H. R. 7978. A similar provision in section 1 (b) of the Executive order under which the board now operates has proven entirely satisfactory.

The fact that the administrative and quasi-judicial functions of the board should be kept distinct from the work of mediation and conciliation is an added reason why its functions should not be transferred to the jurisdiction of the Secretary of Labor. The tendency toward confusion of the two functions is enhanced by confiding them both to the Labor Department.

We conclude that every consideration of congressional precedent in like cases, of efficiency, of giving the board an assured independence in its judicial and administrative work, requires that the board be established as an independent agency in the executive branch of the Government.

With this one exception noted, the National Labor Relations Board heartily endorses H. R. 7978 as a statesmanlike contribution to healthy labor relations and industrial peace.

Sincerely yours,

FRANCIS BIDDLE, *Chairman.*

Section 4: This section deals with matters such as the appointment and salaries of members of the Board, the appointment of personnel by the Board, the transfer of the personnel and records of the old Board established on June 29, 1934, by Executive Order No. 6763, pursuant to Public Resolution No. 44. It is also made clear that orders and proceedings in the courts pursuant to the public resolution, to which the old Board is a party, shall be continued by the Board in its discretion, in order that the important questions of law therein involved may be brought to final determination in the highest courts. In connection with this section, the committee wishes to emphasize two points.

First, there is no conflict with or duplication of the functions of the Department of Labor in its statistical and conciliation work. The bill expressly provides that:

> Nothing in this act shall be construed to authorize the Board to appoint individuals for the purpose of conciliation or mediation (or for statistical work), where such service may be obtained from the Department of Labor.

Conciliation or mediation is desirable in disputes or differences as to wages and hours or conditions of work, where friendly adjustment requires give and take and the compromising of conflicting views.

The work of the Board and its agents or agencies, on the other hand, is quasi-judicial in character, dealing with the investigation and determination of charges of unfair labor practices as defined in the bill, and questions of representation for the purposes of collective bargaining. This of course does not preclude securing compliance, either by a stipulation procedure or otherwise, prior to formal hearing

13

or application to the courts. But the Board and its agents or agencies are required to carry out the declared will of Congress as provided in this definite legislation; the law must have application in all cases, and must not be haggled about or compromised because of the exigency of a particular situation or the weakness of a particular employee group as against a more powerful employer. Under the bill it is contemplated that the Board, its agents or agencies, will not confuse the quasi-judicial nature of their function by intruding upon the regular work of the Conciliation Service of the Department of Labor.

Second, the section authorizes the Board to appoint regional directors and to establish such regional, local, or other agencies as may from time to time be needed. The Board itself cannot be expected in the ordinary case to travel to the scene of dispute; nor can it be expected that the parties or their witnesses must be brought before the Board at the center of government in Washington. Upon the efficiency of permanently established, compensated regional officers and regional agencies operating under the direction of the Board at the source of dispute, will thus depend in an important measure the effective administration of the law.

Section 5: This is a provision commonly incorporated in similar statutes. The importance of holding inquiries necessary to the functions of the Board at places convenient to their proper and expeditious handling, has already been pointed out above.

Section 6: This is a common provision authorizing the Board to make, amend, and rescind such rules and regulations as may be found necessary to implement and carry out the provisions of the bill. It is important to note that the rules will be effective only upon due publication, so that there may be no claims of doubt or ignorance as to their content.

RIGHTS OF EMPLOYEES

The first unfair labor practice in section 8, taken in conjunction with the rights stated in section 7, is merely a restatement of a portion of the language of section 7 (a) of the National Industrial Recovery Act, quoted previously in this report. Similar pronouncements have been made in the Railway Labor Act of 1934, and in other acts of Congress (48 Stat. 1185, sec. 2 (Railway Labor Act of 1934); 44 Stat. 577, sec. 2 (Railway Labor Act of 1926); 47 Stat. 70, sec. 2 (Norris Anti-injunction Act); 47 Stat. 1481, secs. 77 (p) and (q) (Bankruptcy Act); 48 Stat. 214, sec. 7 (e) (Emergency Transportation Act)).

Objection is constantly made that the bill is limited to unfair labor practices by mployers. It is contended that the bill should prohibit "anyone", including of course, an employee or labor organization, from interfering with, restraining or coercing employees in the exercise of these rights, and that without such provision, the bill is "unfair", "one-sided", and would lead to the domination of industry by organized labor. But it is clear that corresponding to the right of employees to be free from interference, etc., by their employer in their organizational activities, is the right of the other party to the negotiations, the employer, to be free in his designation of representatives for that purpose. The Railway Labor Act contains such a reciprocal provision that neither employers nor employees shall in

14

any way interfere with, influence, or coerce the other in their choice of representatives (sec. 2 (3)), but does not deal with organizational activities by employees or labor organizations. Such a reciprocal provision, forbidding employees to interfere with the right of employers to choose their representatives for collective bargaining, would be a merely formal requirement, ignoring the realities of the situation. In the light of common knowledge, it can hardly be said that this right of employers needs protection under this bill. Organizations of employers in trade associations and in national organizations of such trade associations, have blanketed the country; the integration of business into larger corporate units and the formation of such trade associations has not been stopped by the antitrust laws.

Furthermore, a provision forbidding employees to interfere with the right of employers to choose their representatives would not satisfy the opponents of the bill. What is really sought is a legal straitjacket upon labor organizations, on the specious theory that such organizations have no more legitimate concern in the organization of